COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

June 30, 2014

Sean J. Bellew, Esquire
Ballard Spahr LLP
919 North Market Street, 11th Floor
Wilmington, DE  19801

Henry E. Gallagher, Jr., Esquire
Connolly Gallagher LLP
1000 West Street, Suite 1400
Wilmington, DE  19801

Re:  *Xcell Energy and Coal Company, LLC v.
Energy Investment Group, LLC*
C.A. No. 8652-VCN
Date Submitted:  February 18, 2014

Dear Counsel:

Plaintiff Xcell Energy and Coal Company, LLC ("Xcell"), which owns a permit for a coal mine in eastern Kentucky, defaulted on its loan obligations to a creditor, non-party Alpha Credit Resources, LLC ("Alpha").  After Alpha obtained a court-appointed receiver for the company, Xcell, by and through its receiver, now alleges that its past manager and member are liable for their mismanagement and misconduct that supposedly caused those defaults.  Specifically, Xcell asserts claims for breach of fiduciary duty and waste against Defendants Energy

Investment Group, LLC ("EIG") and Polo Investments, LLC ("Polo") and for aiding and abetting, tortious interference with a contract, and waste against Defendant Edmond L. DiClemente ("DiClemente," and together with EIG and Polo, the "Moving Defendants").[1] The Moving Defendants moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6). They contend that Xcell failed to allege the requisite elements—such as a fiduciary relationship or an intent to cause a contract breach—to state a claim.[2]

The Court grants the Moving Defendants' motion to dismiss for the reasons set forth below.

## I. BACKGROUND

A. *The Parties*

Xcell, a Kentucky limited liability company ("LLC"),[3] is in the coal mining business. It owns one permit for one coal mine: Permit No. 877-0175 (the "Permit") for the Grape Creek No. 1 mine (the "Grape Creek Mine"), located in

---

[1] Xcell also asserts claims for breach of fiduciary duty, waste, and conversion against Defendants Gregg Steinhauser Family, LLC ("GSF") and claims for aiding and abetting, tortious interference with a contract, waste, and conversion against Defendant Gregg Steinhauser ("Steinhauser").

[2] The Moving Defendants withdrew their arguments for dismissal under Rules 12(b)(2), 12(b)(3), and 12(b)(5). Stipulation and Order Amending Briefing Schedule (Dec. 2, 2013).

[3] Verified Compl. (the "Complaint" or "Compl.") ¶ 1.

Magoffin and Johnson Counties, Kentucky.[4] The Kentucky Department of Natural Resources (the "Department"), the state agency charged with regulating surface mining, granted the Permit to Xcell in April 2008.[5]

Prior to the appointment of a receiver in June 2013, Xcell was managed by a manager appointed by its member.[6] From 2009 until December 2012, Steinhauser managed Xcell.[7] The Complaint implies, and the Moving Defendants do not dispute, that Polo was Xcell's manager from December 2012 until June 2013.[8] Before January 2013, Xcell's principal place of business was Paintsville, Kentucky; since then, its principal place of business is allegedly Burlington, Connecticut.[9]

---

[4] *Id.* ¶ 7.
[5] *Id.* ¶¶ 35-36.
[6] *Id.* ¶ 1.
[7] *Id.* ¶¶ 5, 7.
[8] *Compare id.* ¶¶ 6, 45, 63, 70, *with* Opening Br. of Defs. Energy Investment Group, LLC, Polo Investments, LLC, and Edmond L. DiClemente in Support of their Mot. to Dismiss ("Defs.' Opening Br.") 22 n.2 ("On or about December 28, 2012, Polo became Xcell's manager.").
[9] Compl. ¶ 1. This newer address is allegedly the same as that of DiClemente's accounting firm. *Id.*

When the Complaint was filed, Xcell had one member: EIG, a Delaware LLC.[10] EIG, likewise, had only one member: Polo, a Connecticut LLC.[11] Polo, in turn, had two members: DiClemente and non-party Nathan Capital Holdings, LP.[12] DiClemente has allegedly represented that he is a manager of Polo.[13]

B. *Xcell Borrows Money from Alpha*

In October 2009, Xcell borrowed $4 million (the "Loan") from Alpha pursuant to the Loan and Security Agreement and a corresponding Promissory Note.[14] The Loan was set to mature on February 21, 2010.[15] In the Loan and Security Agreement, Xcell agreed to maintain material compliance with the Kentucky laws and regulations applicable to its business—namely, the Grape Creek Mine.[16]

---

[10] *Id.* ¶ 2.

[11] *Id.* ¶ 3. Until December 2012, GSF owned approximately 30% of EIG. *Id.* ¶ 4.

[12] *Id.* ¶ 3. The Moving Defendants contest that DiClemente is a member of Polo. *See* Defs.' Opening Br. 5 n.1 ("DiClemente is not a member of Polo."); *see also* DiClemente Aff. ¶ 4 ("I am not now, and never have been, the manager of Polo in my individual capacity."). DiClemente's relationship with Polo is immaterial to the Court's analysis.

[13] Compl. ¶ 6. ("DiClemente has represented that he is a manager of Polo and, as a result, purportedly authorized to manage both EIG and Xcell since at least December 2012.").

[14] *Id.* ¶ 8.

[15] *Id.* ¶ 17.

[16] *Id.* ¶ 16.

Pursuant to the contemporaneous Pledge Agreement, EIG pledged its membership interest in Xcell to Alpha as collateral to secure Xcell's obligations for the Loan.[17] Xcell and EIG also provided confessions of judgment, and EIG further provided its written consent for the Loan.[18]

During its due diligence on Xcell, Alpha commissioned an expert opinion on the value of the Grape Creek Mine's coal reserves. Alpha's expert noted that the Grape Creek Mine "had between 4.295 million tons and 66.1 million tons of permitted and non-permitted coal reserves (respectively) with an estimated value between $12.9 million and $33.1 million (respectively)."[19]

Xcell was to use the proceeds of the Loan for specified business purposes, including purchasing an excavator and preparing the Grape Creek Mine for mining operations.[20] At a deposition in another proceeding, DiClemente allegedly testified that he was unable to identify how Xcell used the Loan proceeds.[21]

---

[17] *Id.* ¶¶ 9-10.
[18] *Id.* ¶¶ 11-12.
[19] *Id.* ¶ 13.
[20] *Id.* ¶ 14.
[21] *Id.* ¶ 15.

C. *Xcell Defaults on the Loan*

Xcell failed to repay the Loan when it matured in February 2010.[22] The parties to the Loan and Security Agreement then agreed to modify Xcell's obligations through the Omnibus Loan Document Modification and Reaffirmation Agreement (the "Modification Agreement") in April 2010.[23]

Under the Modification Agreement, the new Loan balance was approximately $4,743,000, with a maturity date of May 27, 2010.[24] Xcell also agreed to pay a modification fee of $225,000 by May 3, 2010.[25] As part of the Modification Agreement, EIG reaffirmed its obligations under the Pledge Agreement.[26]

D. *Xcell Defaults on the Modification Agreement*

Xcell failed to pay the $225,000 due under the Modification Agreement on May 3. Instead, it made a $100,000 payment on May 6. Consequently, Alpha declared an event of default.[27]

---

[22] *Id.* ¶ 17.
[23] *Id.* ¶ 18.
[24] *Id.* ¶ 20.
[25] *Id.* ¶ 21.
[26] *Id.* ¶ 22.
[27] *Id.* ¶ 23.

The parties to the Modification Agreement next agreed to the First Amendment to Omnibus Loan Modification and Reaffirmation Agreement (the "First Amendment") in early May. Xcell was now required to make a $125,000 payment to Alpha by May 13.[28] As part of the First Amendment, EIG again reaffirmed its obligations under the Pledge Agreement.[29]

E. *Xcell Defaults on the First Amendment*

Once again, Xcell defaulted on its obligations to Alpha, this time under the First Amendment. At the time, the outstanding Loan principal was $4,743,900.[30]

After this default, the parties agreed to the Forbearance Agreement in late May 2010.[31] In the Forbearance Agreement, Alpha agreed not to exercise its default rights and remedies until June 15, 2010, in exchange for an agreement by Xcell, EIG, GSF, and Steinhauser to make two additional payments to Alpha: (i) 730,000 shares of Clean Coal Technologies, Inc. common stock and $10,000 by May 26; and (ii) $59,300 in cash or securities by June 4. After these two

---

[28] *Id.* ¶ 25.
[29] *Id.* ¶ 26.
[30] *Id.* ¶¶ 27-28.
[31] *Id.* ¶ 28.

payments, the outstanding Loan principal (after accrued interest) would be modified to $4,943,900.[32]

As part of the Forbearance Agreement, EIG once again reaffirmed its obligations under the Pledge Agreement. Along with GSF and Steinhauser, EIG also agreed to use its best efforts to liquidate Xcell's assets to repay Alpha.[33]

As of the filing of the Complaint, Xcell's assets had not been sold, and the Loan had not been repaid.[34]

F. *Xcell Receives Notices of Noncompliance Regarding the Grape Creek Mine*

Since Xcell received the Loan proceeds in October 2009, the Department has issued to Xcell nine notices of noncompliance regarding the Permit.[35] Because of continued noncompliance, the Department subsequently issued a failure to abate cessation order and a failure to abate compliance order.[36] In one case, the Department also assessed a $112,500 penalty against Xcell.[37]

---

[32] *Id.* ¶ 30.
[33] *Id.* ¶¶ 31-32.
[34] *Id.* ¶ 33.
[35] *Id.* ¶ 37.
[36] *Id.* ¶¶ 40-41.
[37] *Id.* ¶ 42.

Xcell alleges that the failure of its managers and member to operate the Grape Creek Mine properly has put the Permit at risk of being forfeited or not renewed.[38] Specifically, Xcell claims that, under Kentucky law, the Department may deny permit renewals, revoke a permit, or terminate a mining operation for failure to comply with a notice of noncompliance. Moreover, the Department's determination purportedly may affect anyone who owns or controls the entity that received the permit.[39]

G. *Alpha Seeks Relief against Xcell*

Alpha has attempted to work with Xcell to address the issues identified by the Department, but, allegedly, "Xcell stonewalled all such efforts and refused to work cooperatively with Alpha to rectify the issues."[40] DiClemente also made less-than-pleasant comments to Alpha's representatives and allegedly threatened legal action.[41] In January 2013, Alpha sought the appointment of a receiver for

---

[38] *Id.* ¶ 47.
[39] *Id.* ¶¶ 43-44.
[40] *Id.* ¶ 39. This allegation, among several others, strongly suggests that the entity directing this litigation is not Xcell but rather Alpha.
[41] *Id.* ¶¶ 45-46.

Xcell in Kentucky state court.[42] At the same time, Alpha exercised its foreclosure rights on EIG's membership interest in Xcell.[43]

### H. *Xcell and EIG File for, and then Withdraw from, Chapter 11 Bankruptcy*

Soon after receiving notice of the foreclosure proceedings, DiClemente allegedly caused Xcell and EIG to file for Chapter 11 bankruptcy protection on February 14, 2013. The petitions were jointly administered by the United States Bankruptcy Court for the Eastern District of Kentucky (the "Bankruptcy Court").[44] In the bankruptcy filings, DiClemente certified that Xcell had unliquidated claims against GSF, Steinhauser, and a non-party bank "regarding potential fraudulent transfer and related claims" in an amount exceeding $3 million.[45]

Alpha filed a motion in the Bankruptcy Court seeking relief from the automatic stay to continue the foreclosure proceeding for EIG's membership interest in Xcell. Alpha alternatively sought dismissal of the bankruptcy petitions or conversion to a Chapter 7 proceeding.[46]

---

[42] *Id.* ¶¶ 51-52.

[43] *Id.* ¶ 53.

[44] *Id.* ¶ 54. As of January 2013, Xcell was allegedly insolvent because it did not own sufficient assets to cover its debts, including the Loan. *Id.* ¶¶ 49-50.

[45] *Id.* ¶ 56.

[46] *Id.* ¶ 57.

Xcell and EIG consented to dismiss their bankruptcy petitions voluntarily on May 30, 2013. After finding that "[g]ood cause exists," the Bankruptcy Court dismissed the petitions and enjoined Xcell and EIG, "[u]nder the current ownership and/or management, . . . from filing for bankruptcy relief for a period of 180 days."[47]

I. *The Kentucky State Court Appoints a Receiver for Xcell*

After certain developments not alleged in the Complaint,[48] the Kentucky state court appointed Jonathan Lasko ("Lasko") as Xcell's statutory receiver on June 7, 2013.[49] Ten days later, Xcell, by and through Lasko, filed the Complaint.

Since the filing of the Complaint, Alpha apparently completed the foreclosure proceeding and owns 100% of the membership interests in Xcell.[50]

## II. CONTENTIONS

Xcell asserts four causes of action against the Moving Defendants. First, Xcell claims that Polo, as its manager, breached its fiduciary duties through

---

[47] *Id.* ¶ 58.
[48] Tr. of Oral Arg. Defs.' Mot. to Dismiss ("Tr. of Oral Arg.") 45-46, 48.
[49] Compl. ¶¶ 59-60.
[50] Pl.'s Answering Br. in Opp'n to Defs. Energy Investment Group, LLC, Polo Investments, LLC and Edmond L. DiClemente's Amended Motion to Dismiss ("Pl.'s Answering Br.") 3.

improper conduct, including grossly mismanaging Xcell's business and causing Xcell to file an improper bankruptcy petition. It also claims that EIG, as its member, breached its fiduciary duties by failing to run Xcell for the benefit of its creditors when the company was insolvent.[51]

Second, Xcell asserts that DiClemente, who "represented that he was Polo's manager," is liable for aiding and abetting Polo's breaches of fiduciary duty.[52] Third, Xcell alleges that DiClemente tortiously inferred with various agreements between Xcell and Alpha, including the Loan and Security Agreement, the Promissory Note, the Pledge Agreement, the Modification Agreement, the First Amendment, and the Forbearance Agreement.[53] Fourth, Xcell asserts that the Moving Defendants "caused or contributed to a waste of Xcell's assets and revenue streams."[54]

The primary relief that Xcell seeks is damages.

---

[51] Compl. ¶¶ 62-68.
[52] *Id.* ¶¶ 70-72.
[53] *Id.* ¶¶ 73-75.
[54] *Id.* ¶¶ 76-77.

## III. ANALYSIS

A. *The Procedural Standard of Review*

When considering the Moving Defendants' Rule 12(b)(6) motion, the Court is tasked with determining whether the well-pled allegations of the Complaint meet a minimal pleading threshold—conventionally, whether they state a claim—to justify Xcell's continued pursuit of this action against the Moving Defendants. The procedural standard of review for a Rule 12(b)(6) motion is familiar:

> [The Court] should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.[55]

The Court's analysis is typically limited to the "universe of facts" alleged in the Complaint[56] and any documents attached to it.[57] For limited purposes, however, the Court may consider a document extrinsic to the Complaint if it is (i) integral to Xcell's claims and thereby incorporated into the Complaint, (ii) not being relied

---

[55] *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[56] *See Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del. 2001).

[57] *See Alliance Data Sys. Corp. v. Blackstone Capital P'rs V L.P.*, 963 A.2d 746, 752 (Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009) (TABLE); *see also* Ct. Ch. R. 10(c).

upon for the truth of its contents, or (iii) subject to judicial notice.[58] That said, that the Court may consider certain extrinsic documents does not mean that it *must* consider them.[59]

B. *The Governing Law*

1. The Breach of Fiduciary Duty, Aiding and Abetting, and Waste Claims

In deciding disputes between and among corporate actors, Delaware subscribes to the internal affairs doctrine, a conflict of laws principle under which the internal affairs of a corporate entity are governed by the laws of the state of incorporation or, for an LLC such as Xcell, the state of formation.[60] Claims implicating an entity's internal affairs include breach of fiduciary duty, aiding and

---

[58] *See In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014) (identifying the three exceptions recognized by the Delaware Supreme Court).

[59] Xcell submitted several documents extrinsic to the Complaint less than two hours before the previously-scheduled oral argument on the motion to dismiss. In doing so, Xcell halfheartedly requested that the Court take judicial notice of those documents. *See* Letter from Sean J. Bellew, Esq. (Feb. 18, 2014). Because Xcell's belated submission is procedurally improper under at least Court of Chancery Rule 171(a), the Court declines to consider these materials. Even were it to consider them, the Court is not convinced that they would change any of its conclusions.

[60] *See generally Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982); *see also McDermott Inc. v. Lewis*, 531 A.2d 206, 215 (Del. 1987).

abetting,[61] and waste.[62]  Because Xcell is a Kentucky LLC, Kentucky law governs Xcell's claims for breach of fiduciary duty against Polo and EIG, aiding and abetting against DiClemente, and waste against all three Moving Defendants.

 2.  <u>The Tortious Interference with a Contract Claim</u>

To determine the governing law for a claim for tortious interference with a contract, Delaware follows the choice of law principles of the Restatement and applies the laws of the jurisdiction with the "most significant relationship."[63]  In doing so, the Court should weigh four factors:

> 1) the place where the injury occurred; 2) the place where the conduct causing the injury occurred; 3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and 4) the place where the relationship, if any, between the parties is centered.[64]

DiClemente's allegedly tortious conduct involves various financing contracts for Xcell, which was, until January 2013, based in Kentucky, the same jurisdiction where Xcell and Alpha's relationship was centered.  Based on these and other

---

[61] *See, e.g.*, *Hamilton P'rs, L.P. v. Highland Capital Mgmt., L.P.*, 2014 WL 1813340, at *9 (Del. Ch. May 7, 2014) (discussing the general contours of the internal affairs doctrine).

[62] *See, e.g.*, *Sample v. Morgan*, 914 A.2d 647, 669-70 (Del. Ch. 2007) (applying Delaware law, implicitly pursuant to the internal affairs doctrine, to a stockholder's derivative claim of waste against corporation's board of directors).

[63] Restatement (Second) of Conflict of Laws § 145(1) (1971).

[64] *See UbiquiTel Inc. v. Sprint Corp.*, 2005 WL 3533697, at *3 (Del. Ch. Dec. 14, 2005) (citing Restatement (Second) of Conflict of Laws § 145(2) (1971)).

allegations of the Complaint, the Court concludes, as the parties argued,[65] that Kentucky law governs Xcell's claim for tortious interference with a contract against DiClemente.

C. *The Breach of Fiduciary Duty Claim*

1. The Claim against Polo as Xcell's Manager

Xcell claims that Polo breached the fiduciary duties that it owed the company by virtue of its position as Xcell's manager. The Moving Defendants contend that, because Xcell's Operating Agreement provides that "[t]he Manager shall have no fiduciary duties to the Company,"[66] Polo did not owe any fiduciary duties to Xcell.[67] In response, Xcell effectively conceded this point and agreed to

---

[65] Reply Br. of Defs. Energy Investment Group, LLC, Polo Investments, LLC, and Edmond L. DiClemente in Supp. of their Mot. to Dismiss ("Defs.' Reply Br.") 14-17; Pl.'s Answering Br. 23-24; Defs.' Opening Br. 28-30.

[66] Compl. Ex. 5, Operating Agreement § 4.9.

[67] Defs.' Opening Br. 21-22.

dismiss this breach of fiduciary duty claim against Polo.[68]  These statements by counsel are binding on Xcell.[69]

Accordingly, this claim against Polo will be dismissed as abandoned.[70]

2.  The Claim against EIG as Xcell's Member

Next, Xcell asserts that EIG, through its alleged misconduct, breached its fiduciary duties as Xcell's member.  The Moving Defendants submit that, because Xcell's Articles of Organization provide that "[t]he Company is to be managed by a manager,"[71] EIG did not owe any fiduciary duties as its member.[72]  Xcell, in opposition, asserts that EIG owed it fiduciary duties under Kentucky law, even as a member in a manager-managed LLC.[73]

---

[68] Pl.'s Answering Br. 14 n.1 ("Based on this provision, Xcell will agree to dismiss Count I against . . . Polo."); *id.* 28 ("Defendants' Amended Motion to Dismiss should be denied, with the exception of Count I (breach of fiduciary duties) against . . . Polo, which Xcell will agree to dismiss.").

[69] *See, e.g.*, *Ravenswood Inv. Co., L.P. v. Winmill & Co. Inc.*, 2014 WL 2445776, at *2 (Del. Ch. May 30, 2014).

[70] Based on this conclusion, the Court need not address whether Xcell's Operating Agreement is consistent with Kentucky law or the Moving Defendants' alternative arguments about the insufficiency of specific allegations regarding Polo's improper conduct or about the Operating Agreement's indemnification provisions.  *See* Defs.' Reply Br. 8; Defs.' Opening Br. 23-25.

[71] Compl. Ex. 5, Articles of Organization, Art. VI.

[72] Defs.' Reply Br. 2-3; Defs.' Opening Br. 21-22.

[73] Pl.'s Answering Br. 13-14.

A Kentucky LLC can be managed by its members or by its managers.[74] Under Kentucky law, fiduciary duties are generally concomitant with the responsibility for management of the LLC. Unless provided otherwise in the LLC's operating agreement, if a Kentucky LLC is managed by its managers, then, by Kentucky statute, its members do not manage the LLC and thus do not owe fiduciary duties to the LLC.[75] Here, Xcell's Operating Agreement does not expressly provide that its members owe fiduciary duties. EIG, as the member of Xcell, a manager-managed LLC, thus did not owe fiduciary duties to Xcell under Kentucky law.[76] The sole case on which Xcell relies—which discusses whether a managing, majority member in an LLC owed certain fiduciary duties to the non-

---

[74] *See* Ky. Rev. Stat. Ann. § 275.025(1)(d) (West 2011).

[75] *See* Ky. Rev. Stat. Ann. § 275.165(2) (West 2011); Ky. Rev. Stat. Ann. § 275.170(4) (West 2011) ("Unless otherwise provided in a written operating agreement: . . . (4) A member of a limited liability company in which management is vested in managers under [Ky. Rev. Stat. Ann. §] 275.165(2) and who is not a manager shall have no duties to the limited liability company or the other members solely by reason of acting in his or her capacity as a member."); *see also* Thomas E. Rutledge, *Shareholders Are Not Fiduciaries: A Positive and Normative Analysis of Kentucky Law*, 51 U. Louisville L. Rev. 535, 547 (2013) ("This absence of fiduciary obligations upon the members in a manager-managed LLC [under Kentucky law] applies even as the members retain the authority to approve organic transactions such as amendment of the operating agreement or a merger.").

[76] The Court also notes that Xcell did not raise whether this claim may implicate any implied covenant of good faith and fair dealing under Xcell's Operating Agreement. *See, e.g.*, *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418-19 (Del. 2013).

managing, minority members[77]—does not change the Court's interpretation or application of Kentucky law.

Thus, this claim against EIG is dismissed under Rule 12(b)(6).[78]

D. *The Aiding and Abetting Claim*

In the Complaint, Xcell alleged that DiClemente is liable for aiding and abetting Polo's breaches of fiduciary duty.[79]  Xcell sought to recast its allegations in its briefing and at oral argument, suggesting instead that DiClemente is liable for aiding and abetting EIG's breaches of fiduciary duty.[80]

The Moving Defendants argue that because Xcell abandoned the underlying breach of fiduciary duty claim against Polo and because Xcell did not allege that DiClemente aided and abetted EIG's improper conduct, DiClemente cannot be

---

[77] *See Patmon v. Hobbs*, 280 S.W.3d 589, 593-97 (Ky. Ct. App. 2009).

[78] Again, based on this conclusion, the Court need not address the Moving Defendants' alternative arguments about the insufficiency of specific allegations regarding EIG's improper conduct or about the Operating Agreement's indemnification provisions.  *See* Defs.' Reply Br. 8; Defs.' Opening Br. 23-24.

[79] Compl. ¶ 71 ("Through the actions set forth herein, . . . DiClemente aided and abetted . . . Polo's breaches of [its] fiduciary duties to Xcell.").

[80] *See, e.g.*, Pl.'s Answering Br. 18-20 ("The Complaint adequately pleads that DiClemente aided and abetted EIG's breach of fiduciary duties."); Tr. of Oral Arg. 54 ("He aided and abetted EIG's [breach of fiduciary duty] . . .  That's not in our complaint.").

liable for aiding and abetting.[81] Xcell contends that it has sufficiently stated a claim against DiClemente for his aiding and abetting EIG's misconduct by failing to operate the Grape Creek Mine properly, making unpleasant comments to Alpha, threatening legal action, and filing an improper Chapter 11 bankruptcy petition.[82]

Under Kentucky law, to state a claim for aiding and abetting against DiClemente, Xcell must sufficiently allege: (1) an underlying breach of fiduciary duty; (2) "substantial assistance or encouragement" by DiClemente in effecting the breach of fiduciary duty; and (3) that DiClemente "knew" that the underlying conduct constituted a breach of fiduciary duty.[83] Xcell has failed to allege an underlying breach. First, it abandoned its fiduciary duty claim against Polo. Second, its attempt to rewrite the Complaint to assert that DiClemente aided and abetted EIG's breaches of fiduciary duty is procedurally improper.[84]

---

[81] Defs.' Reply. Br. 11-13; Defs.' Opening Br. 26-28.

[82] Answering Br. 19 (citing Compl. ¶¶ 15, 44-47, 54, 56).

[83] *See Miles Farm Supply, LLC v. Helena Chem. Co.*, 595 F.3d 663, 666 (6th Cir. 2010) (citing Restatement (Second) of Torts § 876 (1979)) (noting that Kentucky subscribes to the Restatement's definition of an aiding and abetting claim); *see also Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991) ("[A] person who knowingly joins with or aids and abets a fiduciary in an enterprise constituting a breach of the fiduciary relationship becomes jointly and severally liable with the fiduciary for any profits that may accrue.").

[84] *See Morgan v. Cash*, 2010 WL 2803746, at *8 n.64 (Del. Ch. July 16, 2010) ("[A] plaintiff cannot use her briefing to rewrite her complaint."); *see also McGowan v. Ferro*, 2002 WL

Thus, because there is no underlying breach of fiduciary duty by Polo, Xcell

has failed to state a claim for aiding and abetting against DiClemente.[85]

E. *The Tortious Interference with a Contract Claim*

Xcell alleges that DiClemente tortiously interfered with no less than six of

its contracts with Alpha.  To state a claim for tortious interference with a contract

against DiClemente under Kentucky law, Xcell must allege six elements:

> (1) the existence of a contract; (2) [DiClemente's] knowledge of the
> contract; (3) that [DiClemente] intended to cause a breach of that
> contract; (4) that [DiClemente's] actions did indeed cause a breach;
> (5) that damages resulted to [Xcell]; and (6) that [DiClemente] had no
> privilege or justification to excuse [his] conduct.[86]

The Moving Defendants argue that Xcell has failed to allege the requisite elements

of this claim, particularly that DiClemente knew of the contracts and that he

---

77712, at *4 n.27 (Del. Ch. Jan. 11, 2002) ("Arguments contained in a brief, however, cannot cure a defect caused [by] the failure to allege critical facts in the complaint.").  In any event, even were the Court permitted to consider the merits of Xcell's argument that DiClemente aided and abetted EIG's misconduct, the Court would nonetheless conclude that Xcell has failed to state an aiding and abetting claim against DiClemente because EIG did not owe fiduciary duties to Xcell.

[85] Based on these conclusions, the Court need not consider whether Xcell's well-pled allegations, to the extent there are any, satisfy the other elements required to state a claim.

[86] *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 6 (Ky. Ct. App. 2012); *see also Hunt Enters., Inc. v. John Deere Indus. Equip. Co.*, 18 F. Supp. 2d 697, 702-03 (W.D. Ky. 1997) ("In order to prove a claim for tortious interference, [the plaintiff] must demonstrate that 'a wrongdoer intentionally meddle[d] with an agreement without justification or invade[d] contractual relations by engaging in significantly wrongful conduct.'") (citation omitted), *aff'd*, 162 F.3d 1161 (6th Cir. 1998).

intended, and did, cause a breach.[87]  Xcell contends that it has satisfied the pleading requirements here, insisting that "DiClemente intentionally caused these [contract] breaches by his gross mismanagement of Xcell's affairs."[88]

The Court concludes that Xcell has failed to allege the six elements necessary to state a claim for tortious interference with a contract.  Even assuming that Xcell has alleged damages caused by DiClemente's supposedly improper conduct, there is no well-pled allegation that, through his mismanagement or otherwise, DiClemente intended to, and did, cause Xcell to breach any of its agreements with Alpha.  Xcell's vague and generalized arguments in its brief and at oral argument failed to identify any well-pled allegations in the Complaint regarding DiClemente's intent—likely because there are no such well-pled allegations.  In sum, there is no basis for the Court reasonably to infer that DiClemente intended for or caused Xcell to breach any of the identified contracts.

---

[87] Defs.' Reply Br. 14-15; Defs.' Opening Br. 28-29.
[88] Pl.'s Answering Br. 23-24 (citing Compl. ¶¶ 34-50).

Thus, the claim for tortious interference with a contract against DiClemente is dismissed under Rule 12(b)(6).[89]

F. *The Waste Claim*

The Moving Defendants contend that since Xcell has not established that Polo, EIG, or DiClemente owed it fiduciary duties, neither can they be held liable for waste.[90] Xcell disputes that contention. It maintains that because DiClemente was allegedly unable to identify how Xcell used the Loan proceeds, the Loan proceeds could not have been used for any valid corporate purpose such that the Moving Defendants must have improperly wasted Xcell's assets.[91]

Courts applying Kentucky law have often looked to Delaware for guidance on novel issues of corporate law.[92] This Court treats a claim for waste arising

---

[89] Based on this conclusion, the Court need not address whether DiClemente, as an agent, can be liable for tortious interference with the contracts of Xcell, EIG, or Polo, as the principals, under Kentucky law. *See* Defs.' Reply Br. 15-17; Defs.' Opening Br. 29-30.

[90] Defs.' Reply Br. 17-21; Defs.' Opening Br. 31-33.

[91] Pl.'s Answering Br. 26-28.

[92] *See, e.g.*, *Bacigalupo v. Kohlhepp*, 240 S.W.3d 155, 157 (Ky. Ct. App. 2007) ("[T]his court has previously adopted Delaware case law when examining corporate statutes . . . ."); *see also Allied Ready Mix Co., Inc. ex rel. Mattingly v. Allen*, 994 S.W.2d 4, 8 (Ky. Ct. App. 1998) (finding Delaware case law persuasive where there was no Kentucky case law "addressing the standard of review to apply to a corporate committee's decision regarding a derivative suit after a demand has been made").

under Delaware law as a species of a breach of fiduciary duty claim.[93] In other words, if there is no fiduciary relationship, then there cannot be liability under a fiduciary-duty-based theory of waste. Xcell did not argue, nor is the Court convinced from its independent review, that Kentucky would depart from this general corporate law principle.

The Court thus concludes that a fiduciary relationship is a necessary element for a waste claim under Kentucky law. Based on the well-pled allegations of the Complaint and Xcell's concession, none of Polo, EIG, or DiClemente owed fiduciary duties under Kentucky law to Xcell. Accordingly, Xcell's claim for waste against Polo will be dismissed as abandoned, and its claims for waste against EIG and DiClemente must be dismissed under Rule 12(b)(6).

---

[93] *See, e.g.*, *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at \*35 (Del. Ch. July 12, 2010) ("The waste test is just another way to examine whether a fiduciary breach has been committed."); *Sample*, 914 A.2d at 669 (citing *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006)) ("Claims of waste are sometimes misunderstood as being founded on something other than a breach of fiduciary duty. Conceived more realistically, the doctrine of waste is a residual protection for stockholders that polices the outer boundaries of the broad field of discretion afforded directors by the business judgment rule.").

## IV.  CONCLUSION

For the foregoing reasons, Xcell has failed to state a claim against the Moving Defendants.  Therefore, the Moving Defendants' motion to dismiss the Complaint against them under Rule 12(b)(6) is **GRANTED**.

**IT IS SO ORDERED**.

Very truly yours,

*/s/ John W. Noble*

JWN/cap
cc:    Mr. Gregg Steinhauser
        Register in Chancery-K